## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CATHERINE MCMULLEN, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 17-4011 |
| ARCADIA UNIVERSITY, | |
| *Defendant.* | |

**PAPPERT, J.**                                                              **April 26, 2018**

### MEMORANDUM

Catherine McMullen worked for over nine years as a patrol officer and corporal in the Department of Public Safety at Arcadia University before her violations of school policies and standards culminated in her termination.  Believing that the disciplinary actions and eventual firing were related to her gender, McMullen sued Arcadia under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*  In Count I of the Complaint, she alleged gender discrimination in the form of disparate treatment and claimed in Count II that Arcadia retaliated against her because she filed complaints with the school against her supervisor as well as a charge with the Equal Employment Opportunity Commission.

Arcadia moved for summary judgment on both claims and the Court heard oral argument on the Motion on April 17, 2018 (ECF No. 30).  In her opposition papers, McMullen did not contest Arcadia's argument with respect to the retaliation claim and her counsel confirmed at oral argument that she abandoned Count II.  (Hr'g Tr. at 2:17–3:2.)  After considering the parties' positions and thoroughly reviewing the record,

the Court granted the Motion and entered judgment for Arcadia on April 20, 2018. (ECF No. 32.) This Memorandum explains the Court's decision.

I

Arcadia, a private university located in Glenside, Pennsylvania, hired McMullen as a part-time patrol officer in December 2007. She became a full-time officer in September 2010. (Mot., Ex. A ("McMullen Dep.") at 44:12–46:22, ECF No. 12-1.) In January 2014, Joanna Gallagher was hired as Director of the Department, and shortly thereafter encouraged McMullen to apply for the newly created position of corporal. (*Id.* at 52:19–52:1, 90:8–91:2; 105:9–12.) McMullen did so and received the promotion. (*Id.* at 105:13–15.) McMullen applied for a second promotion later that year, this time to sergeant. (*Id.* at 127:18–22.) By April 13, 2015, however, McMullen knew she would not receive the job and Arcadia ultimately hired Joseph Kalin for the position on November 17, 2015. (*Id.* at 141:25–142:14; 392:24–393:11, 285:21–22; Hr'g Tr. at 16:17–20, 66:11–14.)

On July 24, 2015, McMullen was verbally warned by Gallagher after a disagreement between McMullen and another patrol officer during which McMullen said that "every time I question something, people want to go fucking running to her [Gallagher]." (Ex. Q ("Suspension Letter") at 11, 13, ECF No. 12-1.) Gallagher instructed McMullen that as a supervisor, it was important to be professional and respectful of her colleagues. (*Id.*)

On January 22, 2016, McMullen received a counseling letter from Deputy Director Steven Johnson because she did not tell her supervisor that another officer failed to report for work on a day when McMullen supervised that officer's shift. (*Id.* at

16; Ex. M ("Johnson Affidavit"), ¶ 9, ECF No. 24-1; Suspension Letter at 16.)  McMullen was told that in the future she should report such absences to her supervisor. (Suspension Letter at 17; Johnson Affidavit, ¶ 11.)

In February 2016, Jeff Cochran was hired as Interim Deputy Director of Public Safety.  (Ex. N ("Cochran Affidavit"), ¶1, ECF No. 24-2.)  The following month, as part of a larger discussion between Gallagher, Cochran and Assistant Vice President of Human Resources Rhonda Hospedales about reorganizing the Department, Cochran solicited McMullen's opinion on how the Department could be improved.  (Ex. B ("Gallagher Dep.") at 317:4–17, 341:9–13, ECF No. 12-1; Ex. B ("Hospedales Dep.") at 139:4–8, ECF No. 12-1; Cochran Affidavit, ¶ 11.)  McMullen suggested eliminating the two corporal positions, one of which she held.  (McMullen Dep. at 278:19–281:24.) Gallagher agreed with this suggestion and ultimately eliminated the position as part of the reorganization.  (Gallagher Dep. at 320:4–10; Hospedales Dep. at 138:13–139:8; Ex. L ("Reorganization Letter"), ECF No. 12-1.)

On March 23, 2016, McMullen was formally disciplined for failing to report an inappropriate comment made by a colleague to a person unaffiliated with the University.  (Suspension Letter at 18–19.)  That same day, McMullen composed an email she intended to send to Kalin.  (McMullen Dep. 226:10–227:6.)  The email was harshly critical of Gallagher, stating that it was "[s]ad how many people lives [sic] she [Gallagher] has ruined, and how much money the University is wasting to keep one person."  (Ex. K, ECF No. 12-1; McMullen Dep. at 220:24–221:3, 226:10–12.) Unfortunately for McMullen, she sent the email to Gallagher instead of Kalin. Gallagher, knowing McMullen was referring to her, forwarded the email to Hospedales.

(Gallagher Dep. at 346:1–3; Ex. K.)  Hospedales considered the email inappropriate and unprofessional, and agreed with Gallagher that McMullen should be suspended. (Hospedales Dep. at 66:12–15, 130:10–12.)  In her deposition, McMullen acknowledged that her derogatory email warranted discipline.  (McMullen Dep. at 300:17–24.)

On April 6, 2017, Hospedales learned that McMullen had filed the previous day a charge with the EEOC, alleging against Arcadia gender discrimination for not promoting her to sergeant and retaliation for McMullen's filing of a related internal ethics complaint.  (Ex. O ("First EEOC Charge") at 7, ECF No. 12-1.)  Despite receiving the EEOC charge, Hospedales decided to move forward with McMullen's suspension. (Hospedales Dep. 126:14–127:5; Suspension Letter at 1.)  Hospedales emailed McMullen the suspension letter on April 7, telling McMullen that she "engaged in unprofessional and disrespectful behavior on March 23rd" by sending the email to Gallagher, the latest in a series of transgressions by McMullen.  (Suspension Letter at 2.)  In addition to the email, the reasons given for her suspension included the July 24, 2015 verbal warning from Gallagher, January 22, 2016 counseling letter from Johnson, and March 23, 2016 written warning for failing to report a colleague's inappropriate comment.  (Suspension Letter at 1, 2, 4.)  McMullen was suspended for three days.  (*Id.*)

On April 8, Gallagher implemented the Departmental reorganization discussed and agreed upon prior to March 23, the date of McMullen's ill-fated email to Gallagher. (Reorganization Letter at 1; Hospedales Dep. at 138:13–139:8.)  In a Department-wide email sent from Gallagher, McMullen learned that the Department would be reorganized and, consistent with her earlier suggestion to Cochran, the corporal positions held by her and Barry Whitney would be eliminated.  (McMullen Dep. at

715:4–17; Reorganization Letter at 1.) With her position eliminated, McMullen again became a patrol officer while Whitney was appointed interim shift supervisor.[1] (McMullen Dep. 282:11–16; Gallagher Dep. 318:4–6; Reorganization Letter at 1.)

Jeff Cochran left the University at the end of June. (*Id.* ¶ 31.) Despite no longer being employed by Arcadia, Cochran continued to send emails from his Arcadia email account to McMullen's personal account. (McMullen Dep. 341:2–6; Hospedales Dep. 150:6–151:5.) After learning of this, Hospedales investigated the conduct, interviewing McMullen as part of that investigation. (Hospedales Dep. 153:7–16; Ex. S ("Last Chance Letter") at 1, ECF No. 12-1.) McMullen initially lied about receiving emails from Cochran after he left the school, but admitted it after being confronted with evidence of those communications. (Last Chance Letter at 1; Hr'g Tr. at 28:1.) Hospedales concluded that Cochran forwarded confidential or privileged University emails to McMullen, and that McMullen continued to make disparaging and inappropriate comments about Gallagher in an attempt to undermine Department leadership. (Hospedales Dep. at 150:6–151:5; Last Chance Letter at 1–2.) Hospedales found that McMullen's conduct violated the University's "Acceptable Use Policy" and "Statement of Civility," but rather than terminating her, she sent McMullen a "last chance letter" on September 15, 2016. (*Id.* at 1–2.) The letter stated that any further violations of University policy or attempts to undermine Department leadership would result in McMullen's termination. (*Id.*)

---

[1] McMullen, with no disagreement from Arcadia, terms the structure which resulted from the reorganization a "demotion," ostensibly because she no longer possessed the supervisory authority she enjoyed as a corporal. Given that McMullen herself supported the abolition of the corporal positions, demotion may not be the most accurate term. McMullen's disagreement with the reorganization seems to be that Whitney was then made interim shift supervisor, a position McMullen felt she deserved. The Court will nonetheless describe the shake out of the reorganization as a demotion when assessing McMullen's allegations of discrimination.

Notwithstanding this warning, McMullen was involved in five incidents in December 2016 and January 2017, including: (1) making an inappropriate statement to the Director of Residence and Commuter Life; (2) changing, without authorization, the password for a public safety camera; (3) publicly questioning two supervisory officers; (4) arguing with a dispatcher and failing to say if she was responding to a call; and (5) falsifying patrol logs. (Ex. T ("Termination Letter") at 1–2, ECF No. 12-1; Hospedales Dep. 224:7–19.) In the first incident, McMullen told the Director of Residence and Commuter Life "I better call in the unlocked door or I might get fired," while in the second McMullen did not have the authority to change the camera's password and she did not inform her supervisors that she did so. (Hospedales Dep. 224:7–19; Termination Letter at 1–2.) In the third incident, McMullen questioned two supervisory officers in a disparaging tone over a decision they made during an emergency situation. (*Id*. at 225:18–23, 237:16–23, 238:13–239:5; Termination Letter at 1–2.) In the fourth incident, the Department was informed that a man was looking into vehicles at Beaver Court, an apartment complex adjacent to the University. Rather than saying if she was responding to the call, McMullen argued with the dispatcher about whether or not the Beaver Court apartments were within the Department's jurisdiction. *See* (Hr'g Tr. at 102:9–12); *see also* (Termination Letter at 3). Finally, the fifth incident involved McMullen allegedly falsifying her patrol log with respect to a separate incident on the same day as the Beaver Court matter. (Hospedales Dep. at 225:22–226:1; Termination Letter at 1–2.) The cumulative impact of these five events led Hospedales and Gallagher to conclude that McMullen's

employment with the school should be terminated and Hospedales fired her on January 22, 2017.  (Hospedales Dep. 220:16–19, 226:4–11; Termination Letter at 2.)

McMullen filed a second EEOC charge on April 5, 2017, alleging gender discrimination and retaliation.  (Ex. U, ECF No. 12-1.)  McMullen's first and second EEOC charges were dismissed, and she received her right to sue letter for both charges on May 24 and June 9, 2017, respectively.  (Compl., ¶¶ 59, 62.)

## II

Summary judgment is proper if the pleadings, discovery, disclosure materials and any affidavits show that there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law.  *Smathers v. Mutli-Tool, Inc./Multi-Plastics, Inc. Emp. Health & Welfare Plan*, 298 F.3d 191, 194 (3d Cir. 2002); *see also* Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986).  A mere scintilla of evidence in support of the non-moving party will not suffice; there must be evidence by which a jury could reasonably find for the non-moving party.  *Id.* at 252.  Summary judgment is appropriate where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009).  The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary

judgment.  *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 566, 665 (3d Cir. 2002).

### III

### A

Arcadia first contends that McMullen cannot challenge its failure to promote her to sergeant, her suspension or the reorganization that led to her demotion because she failed to exhaust her administrative remedies with respect to those issues.  (Mot. at 8.)  Under Title VII, a plaintiff must exhaust all administrative remedies before bringing a claim for judicial relief.  *See* 42 U.S.C. § 2000e–5(e); *see also Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996).  To exhaust administrative remedies, a plaintiff "must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice."  *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S. C. § 2000-e5(e)(1)).  The "parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination, including new acts which occurred during the pendency of proceedings before the [EEOC]."  *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398–99 (3d Cir. 1976) (citations omitted).  A plaintiff's claim must therefore fall "fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom."  *Antol*, 82 F.3d at 1295.

### i

McMullen cannot challenge Arcadia's decision not to promote her to sergeant in April 2015 because she failed to exhaust her administrative remedies with respect to that claim.  McMullen argues that she can do so because she did not discover until

November 17, 2015, within 300 days of her first EEOC charge, that Kalin had been hired to fill the position. (Resp. at 6.) McMullen knew by April 13, 2015, however, that she would not receive the promotion and did not file her first EEOC charge until April 5, 2016, more than 300 days after the alleged unlawful employment practice. *See* (McMullen Dep. 141:25–142:14; 392:24–393:11; First EEOC Charge at 1; Hr'g Tr. at 67:1–10). McMullen's claim accrued when she was informed that she was passed over for the position, not when she later learned that Kalin received the job. *See Oshiver v. Levin Fishbein, Sedran & Berman*, 38 F.3d 1380, 1386 (3d Cir. 1994); *see also Clarkson v. SEPTA*, No. 14-2510, 2014 WL 5483546, at *3 (E.D. Pa. Oct. 30, 2014), *aff'd*, 700 F. App'x (3d Cir. 2017) (holding administrative clock began running when plaintiff knew she had not been promoted, not later discovery of discriminatory motive for that decision).

ii

Arcadia also contends that McMullen failed to exhaust her administrative remedies for the suspension and reorganization resulting in her demotion, which occurred, respectively, on April 7 and 8, 2016. (Suspension Letter at 1; Reorganization Letter at 1.) Arcadia argues that the Supreme Court's decision in *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) bars McMullen's claim based on her suspension and the reorganization because both were discrete acts that occurred after the filing of her first EEOC charge on April 5, 2016, but more than 300 days before the second charge on April 5, 2017. (Mot. at 12–13.) In *Morgan*, the Supreme Court held that "[d]iscrete acts such as termination, failure to promote, denial of transfer or refusal to hire" are "separate actionable unlawful employment practice[s]" which trigger the

300 day limitations period to file an EEOC complaint. *Morgan*, 536 U.S. at 109, 113–14. *Morgan*, however, does not address discrete acts which occur after the filing of an EEOC charge but *during* the pendency of the administrative investigation. *See, e.g.*, *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 303 (4th Cir. 2009) (explaining *Morgan* "does not purport to address the extent to which an EEOC charge satisfies exhaustion requirements for claims of related, post-charge events"); *Briggs v. SEPTA*, No. 14-6226, 2015 WL 4476772, at *3 (E.D. Pa. July 22, 2015) (explaining that *Morgan* does not address post-filing acts, and that *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) and its progeny still govern new acts that occur during the pendency of the administrative investigation); *see also Pourkay v. City of Phila.*, No. 06-5539, 2009 WL 1795814, at *7 (E.D. Pa. June 23, 2009) (citing *Waiters*, 729 F.2d at 237).

McMullen exhausted her administrative remedies with respect to the suspension and reorganization leading to her demotion because both occurred during the pendency of the April 5, 2016 EEOC investigation and were within the scope of the investigation reasonably expected to grow out of that charge. *See Ostapowicz*, 541 F.2d at 399; *see also Pourkay*, 2009 WL 1795814 at *7; *Green v. Postmaster Gen.*, 437 F. App'x 174, 178 (3d Cir. 2011) ("a new complaint is required when "a discrete act…occur[s] *after* [the plaintiff] had received her right-to-sue letter from the EEOC on her earlier claim.") (emphasis added). The suspension and implementation of the reorganization occurred two and three days after she filed her first EEOC charge on April 5, 2016. Both actions were within the scope of the investigation and were reasonably expected to grow out of that first charge; while the individual discriminatory acts were different, McMullen's core grievance of gender discrimination was the same for each of the employment

actions. *See Waiters*, 729 F.2d at 238 (finding subsequent acts of retaliation by different officials within the scope of original EEOC charge alleging retaliation because core grievance, retaliation, was the same); *Thomas v. St. Mary Med. Ctr.*, 22 F. Supp. 3d 459, 469 (E.D. Pa. May 23, 2014) (explaining that courts look to claims "closely related to those included in the administrative complaint"); *DeLa Cruz v. Piccari Press*, 521 F. Supp. 2d 424, 434 (E.D. Pa. Oct. 24, 2007) (explaining that courts are more sympathetic "to allegations pertaining to events that occurred *after* the filing of the EEOC complaint").

IV

McMullen's gender discrimination claim for her suspension, demotion and termination are evaluated under the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). McMullen must first establish a *prima facie* case of discrimination. If she does so, Arcadia must articulate a legitimate nondiscriminatory reason for the adverse employment action. If Arcadia can provide such a reason, the burden shifts back to McMullen to establish by a preponderance of the evidence that Arcadia's stated reason is pretextual. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

To establish a *prima facie* claim of gender discrimination, McMullen must show: (1) that she is a member of a protected class; (2) Arcadia took an adverse employment action against her; (3) she was qualified for the position; and (4) the adverse employment action occurred under circumstances that give rise to an inference of unlawful discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell*, 411 U.S. at 802); *see also Burton*, 707 F.3d at 426. The requirement to

make out a *prima facie* case is not intended to be onerous. *See Sempier v. Johnson &*
*Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) (quoting *Furnco Const. Co. v. Waters*, 438 U.S.
567, 577 (1978) (quotations omitted)).

## A

The Court addresses initially McMullen's claim of gender discrimination with
respect to her suspension and the reorganization, which occurred almost
contemporaneously. Arcadia does not dispute that McMullen has satisfied the first,
second and third elements of a gender discrimination claim with respect to these
employment actions. McMullen is a woman who was suspended and demoted from
corporal, a position for which she was qualified. Arcadia contends that McMullen has
not proffered any evidence giving rise to an inference of discrimination for these
decisions, but that even if she has, she cannot demonstrate that the reasons for her
suspension and the reorganization leading to her demotion were a pretext for unlawful
discrimination. *See* (Mot. at 17–18).

McMullen attempts to establish the fourth element in her *prima facie* case by:
(1) relying on an affidavit submitted by Jeff Cochran;[2] (2) highlighting purported

---

[2]     In fact, McMullen relies heavily on four affidavits in her response to Arcadia's Motion,
including one she submitted even though she was deposed. The other three come from former co-
workers: Jeff Cochran, who joined Arcadia in February of 2016 but quit at the end of June that year,
in part because he considered Gallagher incompetent, unprofessional and unethical (Cochran
Affidavit, ¶¶ 1, 31–34); Steven Johnson, hired by Arcadia in August of 2015, reported directly to
Gallagher but left the school roughly six months later after Gallagher "inexplicably" extended his
probationary period. (Johnson Affidavit, ¶¶ 1, 22–23); and former Assistant Director of Public Safety
Michael Stitley, who started working for Gallagher at Arcadia on December 1, 2014 but then
resigned his position on April 17, 2015 because he considered Gallagher to be unethical. He states
that Arcadia and Gallagher "nearly ruined" his professional life and "temporarily ruined" his
personal life. (Ex. K ("Stitley Affidavit"), ¶¶ 1, 17–23, ECF No. 23-7.) McMullen relies on Cochran's
affidavit to show that University officials allegedly made discriminatory remarks, Johnson's affidavit
primarily to show that she was qualified to be sergeant and that he did not recommend discipline for
an event described in greater detail below, and Stitley's affidavit also to show that she was qualified

inconsistencies in the March 23, 2016 written warning, discussed in her suspension letter; and (3) pointing to similarly situated male employees who were purportedly treated more favorably even though they engaged in similar conduct. (Resp. at 13–17.)

i

In his affidavit, Cochran claims that on his first day of work, Mike Korolishin, who Cochran describes as a "lawyer for the University," said McMullen was a "woman officer who was a big problem" and that Gallagher "wanted her gone." Cochran also says that Gallagher later told him that she did not want a woman supervisor in the Department because she got along better with men. (Cochran Affidavit, ¶¶ 1, 4, 5, 6, 18.) Both Korolishin and Gallagher's statements, assuming their admissibility for purposes of deciding Arcadia's Motion, are at best stray remarks. Such remarks "by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992); *see also Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 358 (3d Cir. 1999) (finding that final decisionmaker's statement that women were unreliable employees because they get pregnant and get breast cancer was a stray remark).

First of all, Korolishin's comment does not reflect any discriminatory animus. McMullen's counsel contended at oral argument that Korolishin's use of the word "woman" reveals the discriminatory nature of the remark. (Hr'g Tr. at 57:11–20.) The fact that Korolishin identified McMullen as a woman is immaterial; it is an accurate description of her gender. *See* (*Id*. at 34:2–4, 63:4–11). Korolishin never said that

---

for the sergeant position. (Cochran Affidavit, ¶¶ 5–6, 18; Johnson Affidavit, ¶¶ 5–8, 18–19; Stitley Affidavit, ¶¶ 2–11.)

McMullen was a "big problem" because she was a woman or that her gender was the reason Gallagher "wanted her gone." (Cochran Affidavit, ¶¶ 5–6.) Even if Korolishin's view of McMullen as a "big problem" could somehow be considered discriminatory, Hospedales and Gallagher made the decisions to suspend and demote McMullen, and counsel conceded at oral argument that Korolishin played no role or had any influence in those decisions. (Hospedales Dep. at 66:12–15, 130:10–12; Gallagher Dep. at 319:10–320:10; Hr'g Tr. at 58:13–59:24.)

As for Korolishin's statement that Gallagher purportedly wanted McMullen "gone," there is no record evidence that such a desire on Gallagher's part had anything to do with McMullen's gender. Gallagher may have wanted McMullen "gone" for any number of reasons, and there is no evidence in the record which would allow a jury to reasonably infer that McMullen's gender was one of them. To the extent Gallagher may have harbored personal animosity toward McMullen, such animosity does not give rise to an inference of gender discrimination. *See Nardella v. Phila. Gas Works*, 997 F. Supp. 2d 286, 295 (E.D. Pa. 2014), *aff'd*, 621 F. App'x 105 (3d Cir. 2015).

Gallagher's statement to Cochran that she did not want a woman supervisor in the Department was made after McMullen was suspended and the agreed upon reorganization implemented and was in response to a question from Cochran as to why another woman, Liz Crawford, had not been promoted.[3] (Hospedales Dep. at 138:13–139:8; Cochran Affidavit, ¶¶ 15, 16–18.) At most, Gallagher's comment was relevant to her decision to reorganize the Department, part of which was the elimination of the

---

[3]     Cochran's affidavit does not explain exactly when he asked this question, why he was inquiring about a third party or why he would ask about someone not being promoted, presumably to corporal, <u>after</u> the corporal position had been eliminated in a reorganization in which he participated. *See* (Cochran Affidavit, ¶¶ 14, 16–18).

corporal position, something McMullen herself recommended. (Hospedales Dep. at 138:13–139:8; McMullen Dep. at 278:19–281:24.)

ii

McMullen signed the March 23 warning and does not deny the events described therein. (Suspension Letter at 18–19.) She argues, instead, that the warning was a "sham" because Johnson never wrote it or investigated the underlying incident. (Resp. at 14, 19; Johnson Affidavit, ¶¶ 18, 19.) There is nothing in the record which shows that the March 23 warning occurred under circumstances giving rise to an inference of gender discrimination. Rather, the record shows that it was Cochran who wrote the warning based on his conversation with Johnson. *See* (Suspension Letter at 15). Moreover, although Johnson says he never investigated the underlying incident, in his affidavit he goes on to claim that he *did* in fact investigate the underlying event and interview McMullen. (Johnson Affidavit, ¶ 18.) Thus, nothing about the March 23 warning occurred under circumstances from which gender animus could be inferred.

iii

Finally, McMullen relies on purported comparator evidence, arguing that a number of male employees at Arcadia were treated more favorably than her despite engaging in similar conduct. (Resp. at 15–17; Hr'g Tr. at 75:1–7.) Comparator evidence is evidence "that the employer has treated more favorably similarly situated persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). "The plaintiff has the burden of demonstrating that similarly situated persons were treated differently." *Id.* Comparators are "employees [who] dealt with the same supervisor, were subject to the same standards, and had

engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273 (3d Cir. 2010).

McMullen cannot demonstrate, on this record, that similarly situated male employees were treated more favorably than she was. *See* (Hr'g Tr. at 75:8–10, 76:6–15). Some male employees McMullen points to are not comparators because they were not similarly situated. *See* (Ex. A ("McMullen Affidavit"), ¶ 49, ECF No. 22-1; Johnson Affidavit, ¶¶ 10, 15; Cochran Affidavit, ¶¶ 19–27). For example, she claims that Sergeant Tom Hannigan and Dispatcher Norm Hodges were not disciplined for various infractions, but McMullen never served as a sergeant or dispatcher during her employment with Arcadia and there is no evidence that Hannigan or Hodges were subject to the same standards as McMullen. (Resp. at 15; Cochran Affidavit, ¶¶ 20, 26; Johnson Affidavit, ¶ 15; Hr'g Tr. at 76:6–16.)

Other employees of McMullen's rank violated Arcadia's policies, but like McMullen and contrary to her assertions, were disciplined for their transgressions. For example, she claims that patrol officers Dustin Hall, Tom Maher and Barry Whitney were never punished for either stealing time or providing false reports on their logs. (Resp. at 15; Cochran Affidavit, ¶¶ 19, 20; Johnson Affidavit, ¶ 15.) There is no indication that McMullen was suspended or demoted for engaging in this type of misconduct. Moreover, all three male officers were disciplined by Gallagher. (Suspension Letter at 2; Reply, Ex. B; Ex. C; Ex. E, 54:11–56:12, ECF No. 25.) Finally, she claims that Whitney was treated more favorably because he was appointed to shift supervisor following the reorganization, a position for which she and Cochran contend

16

she was more qualified. (McMullen Affidavit, ¶¶ 43–44; Cochran Affidavit, ¶ 14; Hr'g Tr. at 79:7–10.) McMullen and Cochran's opinions are immaterial: they do not show that she was in fact more qualified for the new position. Moreover, McMullen and Cochran ignore completely a pretty important piece of evidence supporting Arcadia's decision to give Whitney, as opposed to McMullen, the shift supervisor job: Whitney, unlike McMullen, did not send a derogatory email to Gallagher, about her, less than three weeks before the reorganization was implemented. *See* (Suspension Letter at 1– 2). The fact that Whitney became shift supervisor is nothing from which a jury could infer that McMullen did not receive the job because she is a woman. *See Anderson*, 621 F.3d at 273.[4]

## B

Even if McMullen could establish her *prima facie* case, Arcadia's burden of articulating a nondiscriminatory reason is "relatively light" and is satisfied "if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton*, 707 F.3d at 426 (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotations omitted)). McMullen was suspended for sending a disrespectful and derogatory email **about** her boss **to** her boss, something that at the time was the most recent in a series

---

[4]     McMullen also alleges that other women officers were not, at various times, promoted within the Department. She points specifically to Arcadia's decision not to promote Cynthia Rawlings and Liz Crawford. (Resp. at 17–19.) These women, however, are not comparators because both were within McMullen's protected class. *See Simpson*, 142 F.3d at 645 ("the employer has treated more favorably similarly situated persons *not within the protected class*") (emphasis added). To the extent McMullen refers to Rawlings and Crawford in support of a disparate impact claim, she has failed to establish her *prima facie* case. McMullen is required to identify a specific employment practice and show how that practice causes a disparate impact on the basis of sex. 42 U.S.C. § 2000e-2(k)(1)(A)(i). To show causation, she must present "statistical evidence of a kind and degree sufficient to show that the practice in question has caused exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Ft. Worth Bank & Trust*, 487 U.S. 977, 994 (1988); *see also EEOC v. Greyhound Lines*, 635 F.2d 188, 193 (3d Cir. 1980). She has not done so.

of missteps and incidents involving McMullen. (Suspension Letter at 1.) Further, McMullen was returned to patrol officer after the Department was reorganized and the position eliminated, in part based on her input. (*Id.* at 3–4; Gallagher Dep. 318:4–6, 320:4–10; McMullen Dep. at 278:19–281:24; Reorganization Letter at 1–2.) This is sufficient to satisfy Arcadia's burden.

To show pretext, McMullen must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton*, 707 F.3d at 427. When a plaintiff challenges the credibility of the employer's proffered justifications, she must produce evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Burton*, 707 F.3d at 427. The plaintiff "must show not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir. 1997) (en banc).

McMullen has not produced evidence which could allow a reasonable jury to find that Arcadia's proffered justification for her suspension and the reorganization resulting in her demotion is unworthy of belief or so plainly wrong that it was pretextual. *See Burton*, 707 F.3d at 430 (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 310 (3d Cir. 2012)). McMullen admits that she sent the

disparaging March 23rd email to Gallagher. (Pl.'s Resp. to Def.'s Stat. of Mat. Facts, ¶¶ 57, 58, ECF No. 22; Hr'g Tr. at 15–17.) She also admits that she should have been disciplined for the email; she just felt that a suspension was not warranted. (McMullen Dep. at 300:17–24.) In an effort to show pretext, she claims now that Cochran's affidavit and the March 23, 2016 warning referred to in her suspension letter demonstrate that she was really suspended because of her gender, not for ripping her boss. (*Id.* ¶ 57; Hr'g Tr. at 72:20–24, 77:12–15.)

Again, there is no evidence that Korolishin's comment that McMullen was a "woman officer who was a big problem" reflected discriminatory animus based on McMullen's gender. *See* (Cochran Affidavit, ¶¶ 5–6); *see also supra* Section IV.A.i. As for Gallagher's purported comments, there is no evidence that she wanted McMullen "gone" because of her gender, and her comment that she did not want a woman supervisor in the Department was said in response to a question about someone else and was irrelevant to McMullen's suspension. *See Walden v, Georgia-Pac. Corp.*, 126 F.3d 506, 521 (3d Cir. 1997). Moreover, Hospedales, who does not report to Gallagher, made the final decision to suspend McMullen. (Hospedales Dep. at 11:1–4.) Cochran's affidavit does nothing to undermine Arcadia's nondiscriminatory reason for her suspension.

As for the March 23rd warning, even assuming Johnson never recommended disciplining McMullen, this does not undermine Arcadia's argument that McMullen was suspended because of the email. McMullen may disagree with the disciplinary action Arcadia took over the email, but "[t]he fact that an employee disagrees with an employer's evaluation of [her] does not prove pretext." *Billet v. CIGNA Corp.*, 940 F.2d

812, 825 (3d Cir. 1991), *overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).[5]

With respect to the reorganization that resulted in McMullen returning to patrol officer, McMullen again does not deny that Gallagher and Hospedales were considering reorganizing the Department or that she herself recommended eliminating the corporal position. (Pl.'s Resp. to Def.'s Stat. of Mat. Facts, ¶ 62; Cochran Affidavit, ¶¶ 11, 12; Hospedales Dep. 138:13–14.) Now, in an effort to show pretext, McMullen relies once more on Cochran's affidavit and the fact that Whitney was appointed interim shift supervisor following the reorganization. (Hr'g Tr. at 77:12–15, 79:7–10.) The only relevant statement from Cochran's affidavit is that Gallagher did not want women supervisors in the Department. (Cochran Affidavit ¶ 18.) Gallagher said this, however, after McMullen recommended eliminating the corporal position, the reorganization was complete and in response to a question about Crawford. (Pl.'s Resp. to Def.'s Stat. of Mat. Facts, ¶ 62; Cochran Affidavit, ¶¶ 11, 12.) Nothing about Cochran's affidavit contradicts Arcadia's position that Gallagher, Hospedales and Cochran were discussing the reorganization and that Gallagher decided to eliminate the corporal position prior to McMullen's March 23rd email. (Hospedales Dep. at 138:13–139:8.) Furthermore, although McMullen believes that she deserved to be appointed interim shift supervisor

<hr>

[5] For the first time at oral argument, counsel argued that the suspension letter was pretext because McMullen was never written up for two events described in the letter. (Hr'g Tr. at 74:1–6.) Although it is Arcadia's policy to provide employees written documentation following a written or verbal warning, there is nothing in the record to indicate that McMullen received a warning on either occasion. *See* (Ex. J). Moreover, even if Arcadia was required to provide McMullen documentation of either incident, she has not demonstrated that Arcadia's violation of policy was motivated by gender animus. "An employer's violation of its own policy 'might afford evidence that improper purposes are playing a role,' but such a violation does not necessarily constitute evidence of pretext." *Russell v. Vanguard Grp.*, No. 04-3269, 2006 WL 2077010, at * 3 (E.D. Pa. July 24, 2006) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)); *see also Andersen v. Mack Trucks, Inc.*, 118 F. Supp. 3d 723, 742 (E.D. Pa. 2015), *aff'd*, 647 F. App'x 130 (3d Cir. 2016) ("a mere violation of policy alone cannot constitute evidence of pretext").

instead of Whitney, Arcadia had a very good reason for not rewarding McMullen with a supervisory position: she sent their boss a disparaging email and Whitney did not.

V

A

Arcadia contends McMullen was terminated for reasons including: (1) her statement to the Director of Residence and Commuter Life; (2) changing the public safety camera password; (3) publicly questioning supervisory officers; (4) arguing with a dispatcher and failing to say if she was responding to the call; and (5) falsifying patrol logs. *See* (Termination Letter at 2); *see also supra* Section II. Arcadia argues that McMullen has not offered any evidence giving rise to an inference of discrimination for her termination, and that even if she has, she cannot demonstrate pretext. (Mot. at 15–18.)

The first three elements of McMullen's *prima facie* case are again not in dispute. McMullen attempts to establish the fourth element of her *prima facie* case by: (1) again citing statements in Cochran's affidavit; (2) contending that her last chance letter was a sham; and (3) pointing to similarly situated male employees who were purportedly treated more favorably for engaging in the same conduct described in her termination letter. (Resp. at 13–14, 20–24.)

McMullen turns yet again to Cochran's affidavit in an attempt to show gender animus. (*Id.* at 13.) Neither Korolishin's nor Gallagher's comments were anything more than stray remarks for the reasons provided in Section IV.A *supra*. As for the last chance letter, McMullen argues that it supports an inference of discrimination because she did not violate any written policy by receiving emails from Cochran after his

departure from Arcadia. (Resp. at 19–20.) Violation of a written policy is not, however, a prerequisite for disciplinary action at Arcadia. (Ex. J. ("Arcadia Staff Handbook"), § 130.05, ECF No. 12-1; Hospedales Dep. at 374:20–375:7.) Rather, employees may be disciplined if their performance is unsatisfactory *or* if there is a violation of University policy. (Arcadia Staff Handbook, § 130.05.) Moreover, as the last chance letter makes clear, McMullen was disciplined for receiving confidential or privileged University information from Cochran after he left the University, and for continuing to make disparaging comments about Gallagher and Department leadership after her suspension for the March 23rd email. (Last Chance Letter at 1; Hospedales Dep. at 150:6–151:5.) There is no evidence that the last chance letter was driven, in whole or in part, by McMullen's gender.

McMullen also attempts to establish her *prima facie* case by contending that male employees engaged in the same conduct described in her termination letter but were treated more favorably than she was. (Resp. at 20–24; Hr'g Tr. at 89:16–18.) McMullen again fails to explain how any of these employees are comparators. *See* (Hr'g Tr. at 30:19–25). For example, she claims that Whitney and Kalin were not disciplined for violating Department policy. (Resp. at 21; Hr'g Tr. at 90:22–91:16.) McMullen, however, was disciplined for questioning the decision of the two supervisory officers in a disparaging tone, *not* for violating Department policy. *See* (Hr'g Tr. at 95:9–20, 101:6–25). Moreover, as supervisors Whitney and Kalin were not subject to the same standards as McMullen. (*Id.*) She also alleges that patrol officer Rivera is a comparator because he too was dispatched to the Beaver Court apartment complex the same night as McMullen. (McMullen Affidavit, ¶ 49.) Although Rivera held the same

rank as McMullen, there is no record evidence that he engaged in the same misconduct, specifically, arguing with the dispatcher about whether or not the Beaver Court apartments were within the Public Safety Department's jurisdiction and not stating if he was responding to the call. *See* (Hr'g Tr. at 102:9–12); *see also* (Termination Letter at 3).

B

Even if McMullen could establish her *prima facie* case, Arcadia has articulated several nondiscriminatory reasons for McMullen's termination and McMullen cannot show that these reasons are pretextual. The justification for McMullen's firing—her disciplinary record and the five incidents described in her termination letter—are consistent, legitimate explanations for Arcadia's decision. (Termination Letter at 3.)

McMullen attempts to show pretext by: (1) one last time relying on Cochran's affidavit; (2) arguing that the reasons given for her termination were fabricated; and (3) arguing that she was actually fired for discriminatory reasons because she was not written up for the five events cited in her termination letter. (Resp. at 20–24.) Cochran's affidavit, again, does not help McMullen because the comments described therein occurred approximately nine months prior to her termination and were stray remarks for the reasons discussed in Section IV.A. Moreover, any purported animus Gallagher had toward female supervisors is not relevant to McMullen's termination for the simple reason that McMullen was a patrol officer, not a supervisor, when she was fired. *See* (Hr'g Tr. at 106:17–20).

McMullen also attempts to show pretext by arguing that Arcadia's reasons for her termination were fabricated. (Resp. at 20–24.) To discredit those reasons,

McMullen cannot simply claim that Arcadia's decision was "wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994).  Rather, she must demonstrate such weaknesses, implausibilities or contradictions such that a reasonable factfinder could reasonably find Arcadia's reasons unworthy of belief.  *Id.* at 765.  McMullen denies the charges described in her termination letter and believes that her firing was unwarranted. (Resp. at 20–24; McMullen Affidavit, ¶¶ 49–52.)  It is well-established, however "that neither a simple denial of the charges…nor her own rosier perception of her performance" establishes pretext.  *Fatzinger v. Lehigh Valley Hosp.*, 130 F. Supp. 2d 674, 679 (E.D. Pa. 2001); *see also Billet*, 940 F.2d at 825.  Moreover, to create a question of fact, McMullen must deny these charges and then present some evidence supporting her theory.  *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 475 (3d Cir. 2005).  She has not done so.  McMullen relies almost entirely on her own affidavit, but conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.  *See Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012) (quoting *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009)).  She also cites police and patrol officer reports in an effort to show that the Beaver Court apartment incident was fabricated.  *See* (Ex. R, ECF No. 24-6; Ex. S at 2, 6, ECF No. 24-7).  McMullen's argument here is unclear.  The reports show that McMullen and Rivera were dispatched to the Beaver Court apartments, something that is not at issue. McMullen's termination letter makes clear that she was disciplined for arguing with

the dispatcher over the phone and not telling him if she was responding to the call. (Termination Letter at 3.)

Finally, McMullen believes that the jury could infer that she was fired because she is a woman because she was not, purportedly in violation of Arcadia policy, written up at the time for any of the five incidents that occurred between December 2016 and January 2017 and were described in her termination letter. (Resp. at 20–24; Hr'g Tr. at 87:24–88:5.) Arcadia documents oral and written warnings, but there is no such policy for disciplinary actions such as suspension or discharge. (Arcadia Staff Handbook, § 130.05.) There is no record evidence that McMullen was warned about any of these incidents and Arcadia was therefore not required to document them. (*Id.*)

## VI

The record leaves no doubt that Cate McMullen, Jeff Cochran, Steven Johnson and Michael Stitley neither liked nor respected Joanna Gallagher. A reasonable jury could also infer from the evidence that Gallagher reciprocated those feelings and that her views on her former employees may have influenced her interactions with them. The record also demonstrates, however, that McMullen engaged in various instances of misconduct during her time at Arcadia and that there is no evidence from which a reasonable jury could infer that any disciplinary action taken against her was motivated by gender discrimination.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.